United States District Court
Southern District of Texas

**ENTERED**

March 07, 2025

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BRAD MILLER, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 23-3034 |
| | § | |
| ANADARKO PETROLEUM | § | |
| CORPORATION CHANGE OF | § | |
| CONTROL SEVERANCE PLAN AND | § | |
| ANADARKO PETROLEUM | § | |
| CORPORATION HEALTH AND | § | |
| WELFARE BENEFITS | § | |
| ADMINISTRATIVE COMMITTEE, | | |
| | | |
| Defendant. | | |

**MEMORANDUM AND OPINION**

Occidental Petroleum's 2019 acquisition of Anadarko Petroleum Corporation has generated lawsuits from several former Anadarko employees over Anadarko Petroleum Corporation's Change of Control Severance Plan. The Plan provided employee separation benefits if Anadarko was acquired and those employees had "Good Reason" to resign. The Plan's definition of "Good Reason" included a material change in job duties or compensation. The employee plaintiffs in these cases allege that when Occidental took over, their duties and responsibilities shrank, providing "Good Reason" to resign and receive severance benefits. Occidental generally responds that any diminution of duties and responsibilities was temporary, or due to COVID, and did not trigger a "Good Reason" for them to resign and receive severance benefits.

The Fifth and the Tenth Circuit Courts of Appeals have read the same Plan language differently and have reached different results on similar claims. While the Fifth Circuit's decision

is unpublished and not precedential, this court is, of course, influenced by Fifth Circuit case law. After considering the relevant case law and the administrative record, this court grants the defendants' motion for summary judgment and denies the plaintiff's cross-motion. The reasons for these rulings are explained below.

## I.    Background

This ERISA plan dispute is presented on the administrative record.[1] *See Est. of Bratton v. Nat'l Union Fire Ins. Co.*, 215 F.3d 516, 521 (5th Cir. 2000) ("Once the administrative record has been determined, the district court may not stray from it but for certain limited exceptions, such as the admission of evidence related to how an administrator has interpreted terms of the plan in other instances, and evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim.").

Occidental acquired Anadarko in August 2019. (AR 98). Before the acquisition, Anadarko established the Change of Control Plan ("the Plan"), administered by the Health and Welfare Benefits Administrative Committee ("the Committee"), to address the acquisition's impact on employees. (AR 1). The Committee consists of at least five members appointed by the Senior Vice President for Human Resources. (AR 26).

In late 2019, Anadarko notified its employees that the Change of Control Plan allowed employees to resign within 90 days after a "Good Reason" event and receive separation benefits. (AR 130-133).

The Plan defined "Good Reason" as one or more of the following:

> A.  A material and adverse reduction of your duties and responsibilities as compared to those immediately prior to the Change of Control;

---

[1] See Docket Entry No. 32.

    B.   A material reduction in your Base Salary as compared to your Base Salary immediately prior to the Change of Control;

    C.   A material reduction in the aggregate value of your Base Salary plus Total Target Incentive Compensation compared to such value immediately prior to the Change of Control;

    D.   A change in your required worksite location to more than 25 miles from your location immediately prior to the Change of Control;

    E.   A requirement that you take an assignment or position that requires you to travel on frequent overnight trips resulting in extended stays away from home on a consistent basis and to a substantially greater extent compared to required business travel prior to the Change of Control (excluding assignments or positions that may require temporary travel for a specified, short duration of time); and/or

    F.   A requirement, without your prior written consent, to perform a job for which you are not skilled or trained.

(AR 6).

The Plan stated that "the Committee shall have the discretion to make any findings of fact needed in the administration of the Plan, and shall have the discretion to interpret or construe ambiguous, unclear, or implied (but omitted) terms in any fashion that the Committee deems to be appropriate in its sole judgment." (AR 23).

On September 10, 2019, the Plan issued a document entitled "Anadarko Petroleum Corporation Change of Control Severance Plan Interpretation by the Plan Administrator and Examples." This document clarified the requirements for each of the six "Good Reason" events. (AR 48-51). This document stated that any adverse, material changes in job responsibilities must be permanent, and that temporary changes would not qualify as a "Good Reason" event. (AR 48). On March 23, 2020, the Committee distributed a document clarifying when a reduction in a Plan participant's Base Salary would be a "Good Reason." (AR 52-55). This document stated that Occidental's decision to reduce certain salaries by 4.9%, effective April 1, 2020, was not a material reduction in compensation that would constitute a "Good Reason." (AR 54).

Miller worked for Anadarko Petroleum from 1985 until he resigned in 2020.  (AR 118).  His last job before the Occidental acquisition was as a Director of Regulatory Affairs and Advocacy for the Gulf of Mexico Group.  (*Id.*).  Miller alleges that in this role, he approved budget expenditures of up to $8 million, managed two direct reports, and hired outside consultants.  (Docket Entry No. 37 at 7-8; Docket Entry No. 1 ¶¶ 16-30).  He alleges that by January 2020, after the acquisition, he had experienced adverse material reductions in his job responsibilities, giving him "Good Reason" to resign.

First, Miller alleges that he lost the ability to hire and terminate employees.  Miller points to his efforts to terminate a Staff Regulatory Engineer who worked underneath him due to performance issues.  (Docket Entry No. 1 ¶¶ 44-45).  Miller alleges that his direct supervisor, Allen Sanders, agreed that the engineer should be fired.  (*Id.*).  However, Sanders's supervisor, Andy Kershaw, a "legacy Oxy Executive Vice President," rejected the decision to terminate the engineer.  (*Id.*).  Kershaw also hired an employee to manage Miller's regulatory team without Miller's input.  Miller alleges that before the acquisition, he would have "contributed to hiring for this type of position at Anadarko" and that "the result of the hire also meant that half of Miller's duties were undertaken by someone else."  (*Id.* ¶ 46).

Second, Miller alleges that he lost leadership opportunities.  (*Id.* ¶ 48).  Miller alleges that before the acquisition, he held leadership positions on the Gulf of Mexico Management Committee, attended Gulf of Mexico Management staff meetings, and provided input on strategy and personnel decisions across the Gulf of Mexico department generally.  (*Id.*).  He alleges that after the acquisition, he was no longer included in Gulf of Mexico strategy meetings in which special initiatives, strategic initiatives, forecasting decisions, personnel discussions, and process improvement initiatives were discussed.  (*Id.*).  He was also removed from biannual regional

4

strategic planning offsite meetings that set long-term targets for the Gulf of Mexico operations. (*Id.* ¶ 49). Miller states that he was excluded from annual performance reviews and merit reviews for Gulf of Mexico personnel. (*Id.* ¶ 50).

Third, Miller alleges that his authority to partner with trade organizations was removed and reassigned to legacy Occidental personnel. (*Id.* ¶ 51). Before the acquisition, Miller played a "crucial role" in selecting trade organizations to partner with, and he had the authority to approve invoices for Anadarko to pay those organizations. (*Id.* ¶ 52). Miller was also removed as a voting member for the American Petroleum Institute Drilling Production and Operations Subcommittee. (*Id.* ¶ 54).

Fourth, Miller alleges that his expense approval authority dropped by 99% in every category in which he was previously authorized to approve expenses. (*Id.* ¶ 55). Miller asserts that while Occidental effectively revoked his authority to approve expenses, it increased the expense authority of subordinate employees. (*Id.* ¶ 58).

Miller also alleges that in April 2020, Occidental made a 4.9% across-the-board reduction in compensation for all legacy Anadarko employees, including Miller. (*Id.* ¶ 61). Occidental informed the legacy Anadarko employees that the 4.9% percent was not considered a "material reduction" in pay for the purpose of obtaining separation benefits under the Plan. (*Id.* ¶ 63).

Miller asserts that in May 2020, Kershaw encouraged him to retire "so that the company could make room for younger workers." (*Id.* ¶ 66). Kershaw also suggested to Miller that "retirement may be the only way to protect a pension from business changes at [Occidental] – like the potential for bankruptcy." (*Id.* ¶ 67). Miller alleges that he had no choice but to retire, because he had "lost all of his job responsibilities and authority, and his supervisor encouraged him to retire so that new, younger workers could take his spot." (*Id.* ¶ 67).

On May 19, 2020, Miller submitted a Good Reason Inquiry Form to the Committee. (AR 96-107). Miller stated on the form that at the May 2020 meeting, Kershaw told him that he was the only retirement-eligible member of the Gulf of Mexico Executive Leadership Team who had not provided a retirement date. (AR 103). Kershaw told Miller that he should retire so that the company could make room for other workers to take on leadership positions. (*Id*.). Miller described on the form the ways in which his duties and responsibilities had been materially reduced. (AR 96).

Miller resigned from Occidental on June 19, 2020, before the Committee reached a decision on his Good Reason Inquiry. (AR 108). He submitted a supplemental demand for separation benefits on October 22, 2020. (AR 126-28).

The Committee met to discuss Miller's initial claim for benefits on February 2, 2021. (AR 485-87). The Committee reviewed the Good Reason Inquiry form that Miller had submitted, and discussed interviews that it had held with Kershaw; Amro Hamza, the Director Business Area for Gulf of Mexico Operations; and Ronnie Abraham, the Director of Land Operations. (AR 109).

The Committee denied Miller's benefits claim in a June 2, 2021 letter. (AR 108-114). The Committee stated that it had reviewed the documents Miller had submitted to the Anadarko Petroleum Corporation Change of Control Severance Plan Good Reason Subcommittee; Miller's October 22, 2020 letter describing why Miller believed that he had experienced a Good Reason event; and the Change of Control Plan terms; and the terms of the Change of Control Plan itself. (AR 108-09). The Committee stated that the post-acquisition changes that Miller complained of were either temporary or were intended to address economic downturn and reduced drilling activity rather than to reduce Miller's role at the company. (AR 108-13). The Committee also found that Miller's allegations that other employees at Occidental had encroached on his job

responsibilities and authority were unfounded and that those employees had taken on job responsibilities in areas outside of Miller's responsibilities.  (*Id*.).

Through counsel, Miller appealed the denial of his claim in a letter to the Committee on April 12, 2022.  (AR 191-98).  The appeal raised issues that Miller had not presented in his original claim.  The added issues were that Miller had lost the authority to hire and fire employees in his group; that Miller was no longer involved in high-level strategy and personnel input; and that Miller was no longer involved in identifying and establishing new business relationships.  (*Id*.).  Miller also submitted a letter from Allen Sanders, his previous supervisor at Anadarko.  (AR 208-09).  The letter described Sanders's understanding of Miller's pre-acquisition duties at Anadarko.  (*Id.*).

Miller was notified of the denial of his appeal in a letter from the Committee on August 17, 2022.  (AR 399-409).  The Committee stated that it had investigated each factual basis for Miller's claim and issued extensive findings of fact.  (*Id*.).  The Committee found that as to all five of the core responsibilities that Miller claimed he had before the acquisition—hiring and firing authority, strategy and personnel input, identifying and consummating new business relationships, expense-approval authority, and supervising direct reports—Miller had not experienced a material diminishment in his duties.  (*Id*.).  The Committee also reiterated that the 4.9% base salary reduction did not constitute a "Good Reason" event because it was not a material reduction in compensation and because the 4.9% was reinstated on July 1, 2020, after Miller resigned.  (AR 406).

Miller timely filed this suit against the Plan and the Committee in August 2023.  Miller asserts two claims against the Plan and the Committee: (1) improper denial of benefits under

ERISA § 502 (A)(1)(B) and 29 U.S.C. § 1132(A)(1)(B); and (2) breach of fiduciary duty under ERISA § 404(A) and 29 U.S.C. § 1104(A).  (Docket Entry No. 1¶¶ 79-90).

In Miller's first claim, for the improper denial of benefits, he asserts that the defendants' denial of separation benefits violated the Plan because Miller satisfied the Good Reason requirements when he resigned and sought benefits.  (*Id*. ¶¶ 79-83).  Miller also asserts that the defendants abused their discretion when they denied Miller's separation benefits because they used irrelevant factors and considerations.  (*Id*. ¶ 84).

In Miller's second claim, for breach of fiduciary duty, he asserts that the defendants did not investigate his claim in a fair and objective manner.  (*Id*. ¶¶ 86-87).  Miller asserts that the investigation was biased and "outcome oriented."  (*Id*.)  He also asserts that the defendants' decision to deny his separation benefits and their refusals to reverse on appeal were not supported by substantial evidence and were an abuse of discretion.  (*Id*. ¶ 88).  Finally, Miller asserts that the defendants misrepresented the Plan terms when they found that the 4.9% salary reduction was not material for the purpose of separation benefits under the Plan.  (*Id*. ¶ 89).

## II.    The Legal Standard

Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)).  "A fact is material if it 'might affect the outcome of the suit.'" *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019), *as revised* (Jan. 25, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.* (quoting *Anderson*, 477 U.S. at 248).  When considering a motion for summary judgment, the court "must

consider all facts and evidence in the light most favorable to the nonmoving party" and "must draw all reasonable inferences in favor of the nonmoving party." *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and pointing to record evidence demonstrating that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* FED. R. CIV. P. 56(c). "When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is a dispute of material fact warranting trial.'" *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration adopted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).

"Once the moving party has initially shown that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with specific facts showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quotation marks and quoting reference omitted). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021) (quotation marks and quoting reference omitted). Rather, the nonmovant "must identify specific evidence in the record and articulate the precise manner in which that evidence supports [its] claim." *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (alteration adopted) (quotation marks and quoting reference omitted).

The movant is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. But "[i]f 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson*, 477 U.S. at 250–51). "When parties file cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Green v. Life Ins. Co.*, 754 F.3d 324, 329 (5th Cir. 2014) (citation omitted).

## III.  Analysis

### A.  The Standard of Review

Under ERISA, an individual who is "denied benefits under an employee benefit plan [may] challenge that denial in federal court." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008). "When reviewing a denial of benefits made by an ERISA plan administrator, the court applies a de novo standard of review, 'unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Singletary v. UPS*, 828 F.3d 342, 346 (5th Cir. 2016) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)). "When an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion." *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246, 247 (5th Cir. 2018) (en banc) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989))

An ERISA plan administrator's benefit determinations can be divided into two categories: interpreting the plan terms and determining the facts underlying the benefit claim. The Plan gives

the Committee discretion as to both categories. *See Lu v. Anadarko Petroleum Corporation Welfare Benefits Administrative Committee*, 2023 WL 5254682, at *6 (S.D. Tex. Aug. 15, 2023); (Docket Entry No. 32-1 at 48). In finding that the Plan gave "the Committee significant discretion, extending to both the interpretation of the Plan and fact-finding associated with a particular claim," the court cited Section 9.3(g), which states in relevant part that:

> The Plan shall be interpreted by the Committee in accordance with the terms of the Plan and their intended meanings. However, the Committee shall have the discretion to make *any* findings of fact needed in the administration of the Plan, and shall have the discretion to interpret or construe ambiguous, unclear or implied (but omitted) terms *in any fashion* the Committee deems to be appropriate in its *sole judgment.* The validity of any such finding[s] of fact, interpretation[s], construction[s] or decision[s] *shall not be given de novo review if challenged in court*, by arbitration or in any other forum, and shall be upheld unless *clearly arbitrary or capricious....* If, due to errors in drafting, *any* Plan provision does not accurately reflect its intended meaning, as demonstrated by consistent interpretations or other evidence of intent, or as determined by the Committee in it[s] *sole and exclusive judgment*, the provision shall be considered ambiguous and shall be interpreted by the Committee in a fashion consistent with its intent, as determined by the Committee in its *sole discretion.* (Emphasis added).

In *Lu*, the court reviewed the Committee's denial of benefits for abuse of discretion. In *Lu*, the parties did not dispute that abuse of discretion was the correct standard. In this case, by contrast, Miller argues that the court should apply a *de novo* standard of review. (Docket Entry No. 40 at 9-12). Miller cites *Hoff v. Amended and Restated Anadarko Petroleum Corp. Change of Control Severance Plan*, in which the Tenth Circuit held that the Plan did not give deference to the Committee's construction of the Plan's unambiguous terms, including "Good Reason." 2025 WL 400517, at *4 (10th Cir. Feb. 4, 2025) (Docket Entry No. 55).

In *Hoff*, neither party argued that the Good Reason clause was ambiguous, unclear, or implied. *Id*. The Tenth Circuit held that *de novo* review applied to the Plan's interpretation and application of the "Good Reason" term. *Id.* The Tenth Circuit emphasized that § 9.3(g) gave Occidental "the discretion to interpret or construe ambiguous, unclear or implied (but omitted)

11

terms in any fashion that [it] deemed to be appropriate in its sole judgment" and stated that "[t]he validity of any such finding of fact, interpretation, construction or decision shall not be given de novo review if challenged in court,…and shall be upheld unless clearly arbitrary or capricious." *Id*. The Tenth Circuit concluded that as to unambiguous or clear terms and findings based on such terms, "the Plan … dictates that we apply de novo review." *Id.*

In *Gift v. Anadarko Petroleum Corporation Change of Control Severance Plan et al.*, the Fifth Circuit held that the district court correctly applied the abuse of discretion standard of review to the Committee's Plan interpretation, because the Plan gave the Committee discretion to interpret the Plan terms. 2024 WL 4689051, at *3 (5th Cir. Nov. 6, 2024). Miller argues that this court is not bound to follow *Gift* because it is an unpublished, per curiam decision. But *Hoff*, which Miller encourages the court to follow, is also an unpublished decision, that too by a different circuit. And while not binding, *Gift* is certainly persuasive authority. The court declines to follow the approach set out by the Tenth Circuit in *Hoff*, and instead follows the approach set out in *Gift*, which is consistent with *Lu*. This approach is also in line with the Fifth Circuit's prior observation that most ERISA plans give plan administrators discretion to interpret plan terms. *See Crawford v. Metro. Life Ins. Co.*, 756 Fed. Appx. 350, 352 (5th Cir. 2018).

Miller also asserts that the Committee had a material "conflict of interest" because it both evaluates and pays benefits claims. (Docket Entry No. 40 at 9). Miller argues that this conflict of interest means that the Committee's denial of Miller's benefits claim does not deserve deference. (*Id*. at 13). Miller cites to case law stating that courts should give less deference if there is record evidence of a conflict on the part of the plan administrator. (*Id.*).

The court finds Miller's argument unavailing. "If the administrator has a conflict of interest, 'we weigh the conflict of interest as a factor in determining whether there is an abuse of

discretion in the benefits denial, meaning we take account of several different considerations of which conflict of interest is one.'" *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 247 (5th Cir. 2009) (citing *Crowell v. Shell Oil Co*., 541 F.3d 295, 312 (5th Cir. 2008). "[W]eighing a conflict as a factor in the abuse of discretion analysis does not 'impl[y] a change in the *standard* of review, say, from deferential to *de novo* review.'" *Id.* (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). This type of alleged conflict is one of several factors that the district court must consider in evaluating whether there has been an abuse of discretion; it does not trigger a different standard of review. The "conflict of interest" factor is part of the analysis of abuse of discretion.

Finally, Miller asserts that the Committee's decision must be reviewed *de novo* because it relied on the "extrinsic evidence" of the documents the Committee issued in September 2019 and in March 2020, providing further interpretation of the Plan terms. But in *Lu*, this court held that these subsequent interpretations were consistent with the Committee's powers under Article IX of the Plan. 2023 WL 5254682, at *3. The Committee's review of these Plan interpretations in arriving at a decision as to Miller's benefits does not require *de novo* review.

The court reviews the Committee's decision for abuse of discretion.

## B.  Whether the Committee's Decision Was an Abuse of Discretion

The issues are whether the Committee's interpretation of the Plan was legally correct and whether the Committee abused its discretion in denying Miller's claim for benefits. *See Porter v. Lowe's Cos*., 731 F.3d 360, 364 (5th Cir. 2013). As a claimant under 29 U.S.C. § 1132(a)(1)(B), Miller has the initial burden of demonstrating "that [the] denial of benefits under an ERISA plan [was] arbitrary and capricious." *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512-513 (5th Cir. 2010) (citing *Perdue v. Burger King Corp*., 7 F.3d 1251, 1254 n. 9 (5th Cir. 1993)).

Miller argues that the Committee's decision was neither legally correct nor supported by the record. He argues that "[n]early every facet of [his] working life changed following the Acquisition" and that "[h]is case is exactly why the change of control [Plan] was implemented." (Docket Entry No. 40 at 14).

The defendants respond that the Committee's interpretation of the Plan was legally correct. The defendants also argue that the Committee's decision to deny Miller separation benefits is supported by the record. (Docket Entry No. 34 at 22-24). The defendants argue that the Committee's determination that Miller had not experienced a material change in duties or compensation— "Good Reason"—is supported by substantial evidence and should be affirmed. (*Id.*)

The *Gift* court explained "[i]n evaluating the record to determine whether the interpretation of a plan is 'legally correct,' we consider: '(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan.'" *Gift*, 2024 WL 4689051 at *2 (quoting *Crowell v. Shell Oil Co.*, 541 F.3d 295, 312 (5th Cir. 2008)). "Whether the administrator gave the plan a fair reading is the most important factor." *Id.* (citation and internal quotation marks omitted). "An administrator's interpretation is consistent with a fair reading of the plan if it construes the plan according to the 'plain meaning of the plan language.'" *Id.* (quoting *Threadgill* v. *Prudential Sec. Grp., Inc.*, 145 F.3d 286, 292 (5th Cir. 1998)); *see also Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252 (5th Cir. 2009). "If this court finds that an administrator's interpretation of a plan is incorrect, then we consider whether the interpretation was an abuse of discretion." *LifeCare Mgmt. Servs. LLC*, 703 F.3d at 841 (citing *Chacko* v. *Sabre, Inc.*, 473 F.3d 604, 611 (5th Cir. 2006)); *Crowell*, 541 F.3d at 312.

14

Under Fifth Circuit precedent, if more efficient, "this court can bypass, without deciding, whether the determination was legally correct, and move directly to whether the determination was an abuse of discretion." *Porter,* 731 F.3d at 366. The court exercises its discretion to do so. In determining whether the Committee abused its discretion, the court takes a holistic approach, determining whether "substantial evidence supports the plan fiduciary's decision." *Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 95 F.4th 964, 971 (5th Cir. 2024) (citing *Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 694 F.3d 557, 566 (5th Cir. 2012)). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*.

"[A] decision constitutes an abuse of discretion only if it is made without a rational connection between the known facts and the decision or between the found facts and the decision." *George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349, 353 (5th Cir. 2015) (quoting *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 508 (5th Cir. 2013) (internal quotations omitted). "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Foster v. Principal Life Ins. Co.*, 920 F.3d 298, 304 (5th Cir. 2019) (citation omitted). A "court's review of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end." *Cloud*, 95 F.4th at 971.

Miller first asserts that the Committee "failed to conduct their investigations of Miller's claim in a fair, objective, and evenhanded manner" and that their investigation was biased because of the "conflict of interest" inherent in the Committee's dual role as payor and administrator. (Docket Entry No. 1 ¶¶ 87-88). "If, as here, the administrator both administers and insures the Plan, such a conflict of interest is weighed as one factor in determining whether there is an abuse

15

of discretion." *Porter*, 731 F.3d at 364. "The conflict of interest . . . should prove more important … where circumstances suggests a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Truitt*, 729 F.3d at 509 (citing *Glenn*, 554 U.S. at 112). "It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id*. (citing *Glenn*, 554 U.S. at 117). In *Gift*, the Fifth Circuit found that the Committee had complied with ERISA's procedural requirements by providing the benefits claimant "a reasonable opportunity" for a "full and fair review." *Gift*, 2024 WL 4689051, at *3. "A plan administrator's procedural unreasonableness informs how much weight to afford the apparent conflict." *Truitt*, 729 F.3d at 510. In *Lu*, the court reviewed the record and concluded that the Committee had similarly provided Lu a thorough and fair claim review process. In that case, the record established that the Committee: reviewed the documents that Lu and his counsel submitted in connection with his claim; interviewed three individuals within Lu's group; met a second time to review Lu's claim on appeal, even though Lu did not timely submit his appeal; promptly provided Lu with documents he requested that the Committee had reviewed in conjunction with his claim; and reviewed the extensive submissions that Lu and his counsel submitted in conjunction with the appeal. *Lu*, 2023 WL 5254682 *at 8-9.

Here, as in *Lu*, the record shows that the Committee thoroughly considered Miller's claims. The Committee reviewed all the materials provided and conducted interviews during the first review of the claim and then the appeal. The Committee met six times, reviewing the documents Miller and his lawyer submitted and interviewing seven witnesses. Some of these witnesses, including Sanders, were interviewed at Miller's request. The Committee issued detailed letters explaining its reasoning for denying Miller's initial claim and his appeal. As in *Gift*, the

16

Committee carefully considered new arguments that Miller made for the first time on appeal. The record does not support an abuse of discretion based on a lack of procedural fairness or bias.

Miller repeatedly urges the court to distinguish *Lu* on the basis that the changes in job responsibilities alleged in that case were not as drastic or as permanent as those Miller experienced. (Docket Entry No. 55). Miller instead urges the Court to follow *Hoff*, in which, reviewing *de novo* the denial of benefits, the Tenth Circuit found that the plaintiff had undergone a material reduction in job responsibilities. Because *Hoff* gave no deference to the Committee's determinations, and the abuse of discretion standard applies here, *Hoff* is of limited application.

In arguing an abuse of discretion, Miller claims that the Committee's determination that he had not experienced a "Good Reason" event was not supported by the record. In his first claim for benefits, as well as in the October 2020 supplemental letter, Miller asserted the following differences between his pre-acquisition and post-acquisition duties.

| Responsibilities | Pre-Acquisition | Post-Acquisition |
|---|---|---|
| Expense Authority | $4 million | $12,500; the expense authority of his direct supervisor was increased to $100,000; his subordinates' expense authority was also increased to $8,000. Miller could only approve expenses between $8,000 to $12,500. |
| Direct Reports and Team Size | Three direct reports; team of 12 people. | Two direct reports; team of 10 people. |
| Identifying and Consummating New Business Relationships | Oversaw and approved all Gulf of Mexico-related trade organization and participation; voting member of American Petroleum Institute Drilling, Production, and Operations Subcommittee | Had to submit all trade organization participation for approval to Tom Janiszewski; replaced on API DPOS Subcommittee by legacy Occidental employee |
| Input on Personnel Decisions | Would have been asked for input on any personnel decisions involving his group | Regulatory engineer who Miller previously terminated is rehired by Kershaw and asked by others to work on projects within Miller's area. |

17

Miller also argues that Occidental's 4.9% reduction in compensation for all legacy Anadarko Petroleum employees was a material reduction in base pay. (AR 127). He alleges that this pay cut resulted in a reduction in Miller's salary and "a substantial loss in income." (*Id*.). Finally, Miller argues that Occidental had begun the process of replacing him, or alternatively, implementing a new level of oversight above him. (AR 120). As evidence, Miller cites to the fact that a Director of Land Operations at Occidental, Robbie Abraham, had been attending his team Skype calls, calling his team members and demanding information from them, and assigning those team members work without Miller's input. (*Id*.)

The Committee found that Miller's post-acquisition duties were not materially and adversely diminished. First, the Committee found that Miller's budget authority was only temporarily reduced due to the extreme decline in oil prices. (AR 109). The Committee found that the reduction was only temporary and not specifically directed at Miller, and that as oil prices recovered, approval authority was reinstated. (*Id*.). Second, the Committee found that the reduction in Miller's direct reports was largely due to changes in drilling activity and decisions by other employees to retire, not because of any organizational changes initiated by Occidental aimed at reducing the size of Miller's team. (AR 109-10). The Committee found that the changes were temporary and that, since drilling had increased, more people had been added back to the team. (AR 110).

Third, the Committee found that the employee who Miller claimed was let go from his group and later rehired into a different group, and who Miller claims was handling some of the responsibilities from his group, had been hired by the Director of Facilities to help with a project unrelated to Miller's group. (*Id*.). Fourth, the Committee found that despite Miller's assertions that Occidental was trying to replace him with Abraham, there were no plans to move Abraham

18

into Miller's role.  (*Id*.).  Finally, the Committee found that an Occidental Human Resources investigation showed that Kershaw did not take any actions to discriminate against Miller, or any other employees based on age.  (AR 111, 487).  The Committee reiterated its prior determination that the 4.9% reduction in compensation was not a material reduction and did not constitute a "Good Reason" event.  (*Id*.).

On appeal, Miller asserted that the Committee's decision to deny him separation benefits was incorrect, because he had experienced the following material changes in responsibilities:

| Responsibilities | Pre-Acquisition | Post-Acquisition |
|---|---|---|
| Hiring and Firing Authority | Miller had the ability to hire nine consultants for different projects and was able to transfer an employee onto his team. | Miller lost hiring and firing authority. Miller determined that an employee should be fired for performance issues, but the decision was overruled by Occidental Human Resources and Kershaw. Occidental hired an additional employee out of retirement without Miller's input. |
| High-Level Strategy and Input on Personnel Decisions | Miller met biweekly with the Gulf of Mexico Management Committee for strategic meetings, promotion reviews, and compensation reviews for the Gulf of Mexico region. | Miller was removed from his leadership position on the Gulf of Mexico Management Committee and was no longer authorized to provide input on strategy and personnel. Miller was excluded from Annual Personnel Reviews of all Gulf of Mexico personnel and from Merit Discussions. |
| Identifying and Consummating New Business Relationships | Miller oversaw and approved all Gulf of Mexico-related trade organizations and participation, and he was a voting member of American Petroleum Institute Drilling, Production, and Operations Subcommittee | Miller had to submit all trade organization participation for approval to Tom Janiszewski and Miller was replaced on the API DPOS Subcommittee by a legacy Occidental employee |
| Expense Authority | $4 million | $12,500; the expense authority of Miller's direct supervisor was increased to $100,000; a subordinate's expense authority was also increased to $8,000. Miller could only approve expenses between $8,000 to $12,500. |

| | | |
|---|---|---|
| Direct Reports and Team Size | Three direct reports; team of 12 people. | Two direct reports; team of 10 people. |

Miller also complained that post-acquisition, his 401(k) contributions, bonus targets, and other employee benefits were also materially reduced. (AR 191-198). Miller again complained that the Committee had acted arbitrarily in determining that the 4.9% salary reduction was not material. (*Id*.).

The record reflects that the Committee met five times between June and August of 2022 to discuss Miller's appeal of the denial of his claim. (AR 488-499). The Committee reviewed Miller's appeal letter and new materials provided by Kershaw and Hamza. (*Id*.). The Committee conducted a second round of interviews with Hamza and Kershaw. (*Id*.). The Committee also interviewed the following individuals: Rob Brown, former Director of the Gulf of Mexico Portfolio Management group for Anadarko; Patrick McGrievy, former Director of the Gulf of Mexico Asset Management group for Anadarko; Janiszewski; and Sanders. (*Id*.).

After reviewing the documents that Miller submitted on appeal, and interviewing the additional witnesses, the Committee reaffirmed its prior determination that Miller had not experienced a material adverse change in his job duties. The Committee once again found that the reduction in Miller's expense approval authority was a temporary change caused by COVID's effect on business and was reversed by October 2020. (AR 403). The Committee also found that the scope of Miller's hiring and firing authority had not changed, and that hiring and firing decisions at both Anadarko and Occidental required multiple layers of input. (AR 400-401).

The Committee found that Miller's allegations that his removal from the Gulf of Mexico Management Committee was a substantial reduction in his ability to participate in key strategy and personnel decisions were inaccurate; in fact, the Gulf of Mexico Management Committee was

replaced by the Gulf of Mexico Executive Leadership Team, a broader group that was chaired by Kershaw, in which Miller participated and could in fact provide more significant input than he had had the opportunity to do as part of the Management Committee. (AR 402).

As to Miller's assertions that his authority to select and approve trade association alliances had been moved to another employee, the Committee found that this was not a significant aspect of Miller's role and was more closely aligned with the other employee's responsibilities. (AR 403-04). The Committee also determined that Occidental had discontinued the trade association alliances during COVID. (*Id.*). As to Miller's assertions that he lost direct reports and had the size of his team reduced, the Committee did a detailed analysis of organizational charts and personnel rosters and determined that these changes were reasonable in light of fluctuations in business needs. (AR 404-05). The Committee also found that Miller's direct reports were not reduced during the change of control. (AR 404). Although one direct report transferred to another group, the position remained open while a replacement was identified; the position was not eliminated. (*Id.*).

The Committee also addressed Miller's claims, raised on appeal, that he had suffered a material reduction in his base pay. (AR 406). Citing Section 9.3 of the Plan, the Committee reiterated that it had discretion under the Plan to determine whether a reduction in compensation is material. (*Id.*). The Committee found that Miller's base salary was not materially reduced. (*Id.*). The 4.9% reduction was reversed as of July 1, 2020, for all employees. (*Id.*). The Committee pointed to language in Section 9.3 that explicitly exempted "bonuses, employee benefits … and all forms of incentive compensation" from the definition of "base salary." (AR 41; AR 406).

The record supports the conclusion that the Committee acted within its discretion in finding that Miller's job duties were not materially and adversely reduced. *See George v. Reliance Std.*

*Life Ins. Co.*, 776 F.3d 349, 353 (5th Cir. 2015). For the most part, Miller's arguments before this court are iterations of the same arguments he made in his initial claim for benefits, the October 2020 supplement to his initial claim, and his appeal to the Committee.

For example, Miller states that the record reflects that the cancellation of the Gulf of Mexico Management Committee meetings significantly diminished his duties because, as part of the new Gulf of Mexico Executive Leadership Team, Miller could not vote and was not invited to every Committee meeting. (Docket Entry No. 40 at 21; AR 414). He argues that Anadarko and the Committee "glossed over" the fact that Miller no longer had voting power and only attended "staff meetings" for the Executive Leadership Team. (Docket Entry No. 40 at 21). Miller argues that the Committee focused on the fact that the Executive Leadership Team meetings were larger and more inclusive in finding that the change in Miller's participation was not a diminishment of his duties. (*Id.*). Under Fifth Circuit precedent, in applying the abuse of discretion standard, "the fact that the evidence is disputable will not invalidate the decision; the evidence 'need only assure that the administrator's decision fall somewhere on the continuum of reasonableness—even if on the low end.'" *Porter*, 731 F.3d at 364 (quoting reference omitted). The Committee's determination that Miller had not suffered a material diminishment in duties because post-acquisition, he was invited to attend the larger Gulf of Mexico Executive Leadership Team staff meetings, while he previously sat on the smaller Gulf of Mexico Management Committee and had voting power was not unreasonable. Miller demonstrates only that reasonable minds could have reached different conclusions on whether this constituted a material diminishment or expansion of his duties. This disputed result is insufficient to show an abuse of discretion. *See Holland*, 576 F.3d at 246 ("A plan administrator abuses its discretion where the decision is not based on

evidence, even if disputable, that clearly supports the basis for its denial.") (internal quotations omitted).

Citing *Hoff*, Miller complains that the Committee also abused its discretion in determining that "temporary" changes to job duties—such as the temporary reduction in Miller's expense authority—do not constitute "Good Reason." (Docket Entry No. 36 at 21; Docket Entry No. 40 at 12-14). Miller argues that although the Plan explicitly carves out from coverage certain temporary occurrences, those occurrences did not include a temporary carveout for diminishment of an employee's duties and responsibilities. (Docket Entry No. 40 at 13). Miller argues that the Plan's determination that temporary changes in job function are not "Good Reason" under the September 2019 Plan Interpretation is necessarily arbitrary and capricious.

The *Hoff* court characterized the September 2019 Plan Interpretation as an attempt by the Committee to "shoehorn" the requirement that an adverse and material change in job duties be permanent "by framing it as defining or elaborating on the meaning of 'material' or 'adverse.'" *Hoff*, 2025 WL 400517, at *7. Reviewing the Committee's decision *de novo*, the Hoff court found that the Committee had improperly relied on the September 2019 Plan Interpretation in determining that Hoff had not suffered an adverse and material change in job duties because the changes in his job function were temporary. *Id*.

The *Lu* court reached a different result. In *Lu*, this court found that the September 2019 Plan Interpretation was within the Committee's discretion to interpret the Plan terms by addressing participants' questions about certain scenarios. *See Lu*, 2023 WL 5254682, at *3. The September 2019 Plan Interpretation makes clear that the Committee intended to clarify, and not to restrict, what constitutes a "Good Reason" event. (AR 48-51). Other district courts in this circuit have similarly permitted plan administrators' reliance on plan interpretation documents in interpreting

23

plan terms. *See, e.g., Fifth Amended & Restated Newfield Expl. Co*., 2021 WL 51555699, at *6 (S.D. Tex. May 10, 2021) (affirming the plan administrator's decision to deny benefits when the plan administrator reviewed an "interpretation worksheet" as guidance for interpreting and applying ambiguous provisions of the ERISA plan section used to claim benefits); *Dunn v. Sw. Airlines Co*., 2023 WL 360246, at *1 (N.D. Tex. Jan. 23, 2023) (the plan administrator properly used an "FAQ" document clarifying aspects of the ERISA plan at issue to arrive at the benefits determinations).

The Committee's determination that a 4.9% reduction in base salaries for legacy Anadarko employees does not constitute "Good Reason" is also consistent with the Committee's discretion to interpret the Plan. The Committee determined that Plan language carved out benefits and incentive compensation from base salary; this determination was not an abuse of discretion. (AR 46).

Miller has failed to show a factual dispute material to determining to the reasonableness of the Committee's decision to deny him the separation benefits he sought under Anadarko's Change of Control Plan following the acquisition by Occidental. The court affirms the Committee's decision.

## IV.    Conclusion

The defendants' motion for summary judgment, (Docket Entry No. 34), is granted. Miller's motion for judgment, (Docket Entry No. 36), is denied.

SIGNED on March 7, 2025, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge

24